# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00657-CR

**Brenda Ann Johnson aka Brenda McDonald, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
### NO. 02-727-K26, HONORABLE DONALD LEONARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Brenda Ann Johnson, also known as Brenda McDonald, was convicted on two counts of assault of a public servant. Sentence was assessed at seven years' in prison, probated for five years. On appeal, McDonald contends that the jury charge did not track the evidence of self-defense and that the State's destruction of the tapes of 911 telephone calls denied her due course of law under the Texas Constitution. We affirm the conviction.

The 911 operator in Georgetown received an emergency call from Johnathan Dickerson. He told the operator that he needed an ambulance for his wife—McDonald—who was lying on the floor of their apartment, unconscious and nonresponsive. Although Dickerson recalled that he did not add more details, police testified that their dispatcher told them the caller had said he and his wife had an argument. Georgetown Police Department Officer Bert Witcher also testified that he recalled hearing that there had been "some sort of scuffle," and GPD Officer Amy Beckwith

testified that she recalled hearing that there had been a "fight." McDonald regained consciousness, and Dickerson told the 911 operator that his wife no longer needed an ambulance. McDonald testified that Dickerson made the second call at her direction because she wished to solve their dispute with the help of their pastor. She testified that she was not surprised that police still responded to the first call. In fact, Dickerson's second call served to heighten the officers' concerns for McDonald's safety.

Dickerson, McDonald, and the three police officers who responded—officers Witcher, Beckwith, and Sheryl Self—agree that the officers knocked on the door and announced their presence and desire to speak with the couple, knocked louder on the door and reiterated those intentions, had the dispatcher telephone the apartment and received no answer, and then forced the door open. Upon entering, they found Dickerson in a bedroom sitting on the edge of the bed that was occupied by a barely visible woman covered by bedclothes. Police wanted to speak with Dickerson. McDonald told Dickerson not to speak or leave, and asked the police to leave because there was no longer a problem. The officers declined to leave before gathering more information. They testified that their intent was to question the couple separately. Dickerson did not resist as Officer Witcher escorted him out of the room. Officers Self and Beckwith remained in the room with McDonald.

The police and McDonald gave differing versions of what happened next. Self and Beckwith testified that McDonald had become extremely agitated and that they told her to calm down and stay in the room. They testified that, as Witcher took Dickerson out of the room, McDonald rose up and attempted to follow him. They then pushed her back down on the bed. They admitted that they may have each lifted one of their legs off the ground to apply more body weight

2

to keep McDonald in the bed. McDonald testified that, instead of escalating their use of force, the officers jumped on her as Witcher and Dickerson left the room. The officers and McDonald agree that McDonald then began flailing her arms and kicking them, though McDonald testified that she was attempting not only to rejoin Dickerson, but to escape the officers and the pain they were inflicting on her. After McDonald kicked and hit the officers, using escape techniques she learned at her workplace, the officers retreated and Self attempted to block the door. McDonald forced her way past Self, knocking Self's head against the door frame a few times in the process. McDonald ran to another room, called her pastor, and yelled out a window to Dickerson to remind him to remain silent.

McDonald was indicted for assault on a public servant—one count each for officers Self and Beckwith. The jury was instructed to consider whether she acted in self-defense. The jury convicted her on both counts.[1] McDonald was sentenced to seven years in prison for each count, to be served concurrently. Both terms were probated for five years.

McDonald contends that the trial court submitted a jury charge containing a definition of self-defense that erroneously did not track the evidence. Because McDonald did not raise this objection to the charge at trial, she must show egregious harm in order to gain reversal of the judgment. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985); *see also* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). She must show that the error was so egregious that it deprived her of a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. We must evaluate any harm

---

[1] This appeal arises from the second trial on these charges. McDonald's original convictions and probated two-year sentence were reversed by this Court. *Johnson v. State*, 172 S.W.3d 6 (Tex. App.—Austin 2005, pet. ref'd).

from the error in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.*

The purpose of the jury charge is to inform the jury of the applicable law and guide them in its application to the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977). The charge should lead the jury and prevent confusion, rather than merely avoid misleading or confusing the jury. *Delgado*, 235 S.W.3d at 249. Although the trial judge has an "absolute sua sponte duty" to prepare a charge that accurately sets out the law applicable to the specific offense charged, the court does not have a similar *sua sponte* duty to instruct the jury on all potential defensive issues because the decision whether to submit those may be in part a function of the defendant's trial strategy. *Id.* at 249-50. Absent evidence to the contrary, we presume the jury followed the law provided by the charge. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996).

The court defined self-defense as follows:

A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.

"Unlawful" means criminal or tortuous or both and includes what would be criminal or tortuous but for a defense not amounting to justification or privilege.

The use of force against another is not justified:

(1) in response to verbal provocation alone;

(2) if the actor provoked the other's use or attempted use of unlawful force, unless the actor abandons the encounter, or clearly communicates to the other

4

his intent to do so reasonably believing he cannot safely abandon the encounter; and the other nevertheless continues or attempts to use unlawful force against the actor; or

(3) to resist an arrest or search that the defendant knows is being made by a peace officer, even though the arrest or search is unlawful, unless before the defendant offers any resistance, the peace officer uses or attempts to use greater force than necessary.

This definition parallels the language from the self-defense statute. *See* Tex. Penal Code Ann. § 9.31 (West Supp. 2008).

McDonald contends that the definition was erroneous because it did not track the facts of the case. McDonald asserts—without dispute—that the only evidence admitted at trial was to the effect that the officers did not intend to arrest McDonald when they began talking with her. Rather, they only intended to detain her in the bedroom to separate her from Dickerson. She argues that "the jury could have easily been confused to believe that the theory of self-defense would not apply to Appellant's situation." She contends that the jury charge should have included the following definition: "unless before the defendant offers any resistance, the peace officer uses or attempts to use greater force than necessary to make the arrest, search, or detention."

The trial court did not err egregiously or deprive McDonald of a fair and impartial trial by submitting the instruction it did. McDonald argues not that the definition departs from the statute, but that it does not track the evidence. She contends that the definition given was not warranted by the evidence because the officers testified that they did not intend to arrest or search her at the time they used force against her and she against them. McDonald's argument overlooks the possibility that the court might have included the instruction in an abundance of caution,

5

reasoning that the jury might reject in whole or in part the denials that an arrest was in progress. The trial court might also have decided that the evidence raised the possibility that the officers either were engaged in an unlawful arrest or search or they began unlawfully trying to arrest her after the physical altercation began. Even if the court erred by giving the definition it did, we do not see how McDonald was deprived of a fair and impartial trial under these circumstances. The challenged definition was submitted as one of three disjunctive examples of when self-defense was *not* justified. If the jury determined that no arrest or search was underway or intended, then the condition of this exception was not met, and the jury would have ignored this exception to the justification of self-defense. If anything, a finding that the police were using unlawful force against her while lacking the excuse of arrest or search *removed* a potential restriction on the jury's ability to find McDonald's use of force to be justified. We reject the proposition that the presence of the challenged definition deprived McDonald of a fair and impartial trial in light of the remainder of the record—particularly the weight of the evidence supporting the jury's findings.

We also find no error in the failure to give the instruction McDonald proposes on appeal. The self-defense statute does not contain a detention provision. *See id.* We are cited to no case law for the proposition that such a provision has been grafted onto the statute or that this Court should and can do so. The trial court did not commit fundamental error by failing to give a definition not requested by a party and not founded in the existing law.

McDonald also complains that the State deprived her of due course of law under the Texas Constitution and that her trial was fundamentally unfair because the State destroyed the tape recordings of Dickerson's two 911 telephone calls. She concedes in her brief that there is "no

6

evidence that the State intentionally destroyed the 911 tapes," but argues that the tapes were important to the issue of self-defense because they would have helped the jury to determine whether police had a lawful right to be in her home and to better assess the justification for her actions. The destruction of the tapes, McDonald argues, deprived her of her right to due course of law under the Texas Constitution.

The State has a duty to preserve evidence that possesses "an exculpatory value that was apparent before the evidence was destroyed." *California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *see Jackson v. State*, 50 S.W.3d 579, 588-89 (Tex. App.—Fort Worth 2001, pet. ref'd); *Mahaffey v. State*, 937 S.W.2d 51, 53 (Tex. App.—Houston [1st Dist.] 1996, no pet.).[2] The accused must show that the State acted in bad faith when it failed to preserve the evidence in order to show a violation of the right to due course of law. *Jackson*, 50 S.W.3d at 589; *Mahaffey*, 937 S.W.2d at 53; *see also Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). A defendant must demonstrate the lost evidence is both favorable and material to her case. *See Jackson*, 50 S.W.3d at 589 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982)); *Mahaffey*, 937 S.W.2d at 53. A showing that the lost evidence might have been favorable does not satisfy the materiality standard.

---

[2] McDonald argues that the protections of the Texas Constitution's right to due course of law exceed those of the federal constitution's due process guarantees. *See Pena v. State*, 166 S.W.3d 274 (Tex. App.—Waco 2005), *vacated*,191 S.W.3d 133 (Tex. Crim. App. 2006), *on remand*, 226 S.W.3d 634 (Tex. App.—Waco 2007, pet. granted). As noted by the Fourteenth Court of Appeals, several Texas courts have held that the state constitution's protections are coextensive with the federal constitution's protections in this area. *See State v. Vasquez*, 230 S.W.3d 744, 750 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Even under the broader protections of a *Pena* analysis, *see Pena*, 226 S.W.3d at 654, we would find no violation of McDonald's right to due course of law.

*Jackson*, 50 S.W.3d at 589; *Hebert v. State*, 836 S.W.2d 252, 254 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd).

McDonald failed to demonstrate reversible error on this record. She does not show that she preserved this error by making this argument at trial. *See* Tex. R. App. P. 33.1. She does not show or allege that the State acted in bad faith when destroying the tapes.[3] She does not contend that the tapes of the 911 calls bear on the altercation between her and the officers except as they explain whether the officers had a legal right to be in her apartment. She does not, however, explain how the tapes would have shed light on whether the police had a legal right to be in her apartment. She does not explain why the tapes are necessary, given that the officers and Dickerson all testified regarding the substance of the 911 calls with few differences.[4] The most significant difference in their versions of the calls is that Dickerson did not recall reporting that he had choked his wife, but there is no showing that this difference has a legal distinction given the report that she was unconscious, the retraction of that report, and the suspicion generated in the officers' minds by the report, retraction, and refusal to answer the door or telephone. The jury also heard a tape recording of the police radio traffic as events unfolded, including the dispatcher's summary of the telephone call that conformed to the police officers' version of the telephone calls.[5] McDonald and Dickerson presented her version of events that included her request that the officers leave her apartment and

---

[3] The prosecutor stated that the recordings had been destroyed as a matter of course in the absence of a request that they be preserved.

[4] The officers were not parties to the 911 calls.

[5] According to the reporter's record, the dispatcher stated on the tape, "Male subject advised him and his wife got into a fight and that she needed an ambulance and then he advised that they don't need an ambulance at this time."

her recollection that the officers jumped on her without any warning or provocation.  The jury, apparently, did not accept that version of events.  Although the tapes would have been the best evidence of the content of the 911 telephone conversations, we are not persuaded that, on the facts and arguments presented, their destruction deprived McDonald of her right to due course of law and a fair and impartial trial.

Affirmed.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed:   November 13, 2008

Do Not Publish